In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3513

MISTY ROBY,

*Plaintiff-Appellant,*

*v.*

CWI, INC. d/b/a Camping World, Inc.,
a Kentucky corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4520—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED MAY 7, 2009—DECIDED AUGUST 27, 2009

Before FLAUM and WILLIAMS, *Circuit Judges*, and
LAWRENCE, *District Judge.**

LAWRENCE, *District Judge.* Misty Roby is a former
employee of CWI, Inc. She sued CWI under Title VII of
the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*,

---

* The Honorable William T. Lawrence, United States District
Judge for the Southern District of Indiana, sitting by designation.

alleging that she was sexually harassed by a supervisor, Joe Schiavone, and subjected to retaliation for her complaints. CWI moved for summary judgment on these claims in the district court, which was granted, and Roby now appeals the district court's decision.

For the reasons that follow, we affirm the district court's decision.

## I. Background

We present the facts in the light most favorable to Roby. Roby began working for CWI as a cashier in May 2005 at CWI's store in Bolingbrook, Illinois. At the time, Schiavone worked in the service shop of the store. Roby contends that Schiavone began making sexually suggestive statements to her in June 2005. According to Roby, on one occasion Schiavone went to her station to get money and kneeled down near her legs. When Roby asked if she should move, Schiavone responded, "No, I like it down here." On another occasion, Schiavone left work to test drive a truck. When Schiavone returned, he told Roby and Laura Philips, Roby's co-worker, that the test drive got him excited and that his pants were now tight. He also nudged Roby at that time, suggesting that his comment was sexual.

Roby did not report these incidents at the time that they occurred, and sometime in either June or July she took maternity leave. While Roby was on leave, Schiavone reportedly told another supervisor, Chris Gartzke, that he would either lose his job or his wife when Roby re-

turned from maternity leave. When Gartzke asked Schiavone what he meant by the comment, Schiavone responded that he could tell by the way Roby looked at him that "she wants me." When Roby later learned heard about this comment, it made her feel uncomfortable.

Roby subsequently returned to work in September 2005. While she was working at a computer station, Schiavone came up behind her and pressed his body against her buttocks, making Roby feel uncomfortable. On other occasions, Schiavone would put his arm around Roby's shoulders and become aggravated when Roby asked him to leave her alone. Schiavone evidently ignored Roby's protestations because at one point he slapped her on the buttocks with a file. When Roby told Schiavone not to touch her, he replied, "Ooh, feisty."

Thereafter, on or about November 8, 2005, Roby had a casual conversation with Philips seeking feedback on Schiavone. Roby commented that she could inform the corporate office about something that it "would not be applauding" about Schiavone. General Manger Karl Ziarko overheard the comment and had Roby follow him and Retail Sales Manager Tim Heaton to the store office to explain the comment. Roby then revealed what she perceived to be inappropriate conduct by Schiavone.

Upon hearing Roby's complaints, Ziarko immediately relayed it to Human Resources Manager Sarah Sack. Sack promptly began an investigation, interviewing various employees about the allegations. She instructed the interviewees that the investigation was confidential. She also reviewed a written statement Roby had prepared

and Schiavone's personnel file, which did not contain any prior complaints. In addition, while Sack was conducting her investigation, Ziarko and Heaton attempted to rework the store schedule to ensure that at least one of them would be in the store during all working hours so that Roby would be comfortable at work and know that she could approach them at anytime. Given the small number of employees at the store, they could not prepare a schedule that prevented an overlap in Roby's and Shiavone's schedules. However, they did try to minimize the times when they would close the store together. Roby, for her part, contends that she repeatedly complained about having to work with Schiavone and requested that this not occur.

While the investigation was still being conducted, Roby informed Sack that Schiavone was "looking at her funny" by glaring and staring at her and saying that "nothing happens to a Mason." Roby also told Ziarko, who relayed to Sack, that Schiavone pushed her on the hip and told her to "hurry up" and assist with the store closing when she was socializing with a co-worker. Sack included these incidents in her investigation. Moreover, Roby complained that Gartzke and another employee violated confidentiality by speaking to her about her allegations against Schiavone, and she claimed that Gartzke asked if she would sue him if he tried to get in the car with her. Sack investigated this latter complaint and learned that the other employee had not said anything inappropriate and was not even aware of the allegations before the conversation or its confidentiality. Gartzke, on the other hand, was immediately terminated for breaching confidentiality.

After completing her investigation, Sack concluded that Schiavone's conduct did not rise to the level of unlawful harassment. However, she found that his comments about "liking it down here" and the tight pants were inappropriate. As a result, Schiavone received a three-page written warning and was required to undergo anti-harassment policy training and reviews. Schiavone was also told that if he spoke to Roby about the incidents or attempted to retaliate he would be terminated. He claims that he engaged in no further activity, although Roby claims that the stares and glares continued and she thought that Schiavone wanted to get her.

In addition to the disciplinary measures, Roby received a letter dated November 28, 2005, that thanked her for coming forward, informed her that corrective action was being taken, and reminded her that she should immediately report further instances of inappropriate conduct to Ziarko or Human Resources. Toward the end of December, Roby contacted Sack and told her that she did not want to finish her shift because she was scheduled to close the store alone with Schiavone. CWI contends that this was not true and that someone else was scheduled to work as well. Nonetheless, Sack took Roby at her word and gave her permission to go home. Sack also told Roby that she was excused from work until Ziarko returned from vacation in early January 2006.

In early January 2006, Roby stopped by the store to meet with Ziarko and Heaton and requested never to be scheduled to work at the same time as Schiavone. Ziarko

communicated the request to Human Resources but could not accommodate Roby because of the store's small size; however, CWI attempted to ensure that the two would not have to close the store together. Around the same time, Roby called Sack, who told her that she was on the schedule and to contact Ziarko and Heaton about returning to work. Roby asserts that she understood that she was on some sort of leave; however, she never returned to work again or informed CWI that she did not want to work at the store anymore. Nonetheless, CWI continued to pay Roby through February 2006 and kept her on the weekly schedule until March 2006, and it listed her as "active" on its payroll system until September 2007. At no time did CWI tell Roby that she was terminated.

## II. Discussion

We review a district court's summary judgment decision de novo. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009). Summary judgment is proper where "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A. Hostile Work Environment Claim

Title VII forbids workplace discrimination based on an individual's sex. 42 U.S.C. § 2000e-2(a)(1). One of the ways in which this prohibition can be violated is through sexual harassment that is either severe or pervasive

enough to create an abusive working environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Roby contends that Schiavone's actions amounted to unlawful sexual harassment by a supervisor. Although CWI disputes that Schiavone was actually Roby's supervisor, it does not challenge that conclusion on appeal. Therefore, to withstand summary judgment on her claim of a hostile work environment, Roby must demonstrate that: (1) she was subjected to unwelcome conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). Because this case involves a supervisor, CWI will be held strictly liable for the alleged conduct if there was a tangible employment action such as a discharge, demotion, or a change in working conditions. *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). *See also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). A constructive discharge may also be considered a tangible employment action. *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003). If there was no tangible employment action, then CWI is entitled to assert an affirmative defense that (1) it exercised reasonable care or diligence to prevent and correct any harassing behavior; and (2) that Roby unreasonably failed to take advantage of any preventive or corrective opportunities to avoid harm. *Ellerth*, 524 U.S. at 765. If CWI can establish both of these factors, it is not liable for Schiavone's conduct. *Id.*; *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007).

Here, CWI challenges whether Schiavone's conduct rose to the level of an actionable hostile work environment and whether there was a tangible employment action. With respect to the former, Roby clearly believes that she experienced harassing conduct. She has alleged that Schiavone made various inappropriate and sexually-tinged comments over numerous months and that he physically touched her, including an incident where he smacked her on her buttocks and another where he rubbed his body against her buttocks. Assuming that this conduct occurred, Schiavone's actions were definitely deplorable.

This reprehensibility aside, whether Schiavone's actions were severe or pervasive enough to rise to the level of actionable conduct is another issue, and one that we need not decide given CWI's more compelling argument on whether there was a tangible employment action. Although Roby argues in her briefs that she was effectively terminated when she was taken off of the work schedule, the record belies her position. Specifically, the evidence shows that Roby understood that she was merely on leave from December 2005 until January 2006 when she was supposed to make arrangements with Ziarko and Heaton for returning to work; however, Roby never returned to work. Nonetheless, CWI kept Roby on the weekly schedule for several months and on its payroll system until September 2007. This is a far cry from termination.

Perhaps recognizing the difficulty with demonstrating an actual employment action, Roby's counsel resorted to

arguing Roby's alternative theory that she was constructively discharged when he was pressed at oral argument about the adverse employment action she claims to have suffered. As this Court has noted, constructive discharge occurs when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation. *Saxton v. AT&T Co.*, 10 F.3d 526, 536 (7th Cir. 1993). Such cases require a plaintiff to show a more egregious situation than a hostile work environment because an employee is normally expected to continue working while seeking redress. *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). Whether the plaintiff's work environment meets the standard for a constructive discharge is determined from the viewpoint of a reasonable employee. *Saxton*, 10 F.3d at 537.

Here, there is insufficient evidence to show that this is a case of constructive discharge. Specifically, Roby has not presented any evidence indicating that her working conditions were so intolerable that she had to quit. For example, there is no evidence of the types of threats to Roby or her employment that would lead a reasonable person to believe that she needed to quit her job to protect herself. *See, e.g.*, *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1198-99 (7th Cir. 1992) (finding constructive discharge where supervisor brandished a firearm and held it to the plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir. 1989) (finding constructive discharge where co-worker grabbed the plaintiff and threatened to kill her). At best, Roby can merely point to her own testimony that Schiavone would

stare and glare at her and her subjective belief that he wanted "to get her," but even Roby's counsel characterized this activity at oral argument as simply "high school stuff."

Likewise, the evidence does not support Roby's contention that she was constructively discharged because she was required to keep working in close proximity to Schiavone after she complained about harassment. For instance, there is no evidence that Schiavone spent an inordinate time around Roby after he was disciplined or that he hovered over her while she was working. In fact, the undisputed evidence suggests that the contrary is true. Specifically, Schiavone had a variety of duties as the manager of the service shop that did not require him to be near or in close proximity to Roby as she contends. Moreover, CWI attempted to minimize Roby's contact with Schiavone as much as possible by reworking the schedule to limit the times when both of them would be closing the store and to ensure that one of the other supervisors would be in the store at the same time in case Roby needed to approach them about a problem with Schiavone. Finally, Roby also was explicitly advised in her November 2005 letter to report any further problems she experienced so that CWI could address them. These circumstances illustrate the efforts CWI made to reduce the number of future contacts between Roby and Schiavone and belie Roby's assertion that she was continually required to work in close proximity with him. In short, rather than demonstrate constructive discharge, the evidence reveals that Roby essentially just quit coming to work while CWI was attempting to resolve the issue with Schiavone.

Because Roby cannot demonstrate that there was a constructive discharge or any other tangible employment action, CWI is entitled to raise its affirmative defense, which we conclude is dispositive of this matter. First, CWI presented evidence demonstrating that it exercised reasonable care to prevent and correct Schiavone's conduct. Specifically, it performed an investigation, instructed interviewees that the information was confidential, fired Gartzke when he breached confidentiality, and disciplined Schiavone by issuing a written reprimand and ordering him to attend education and retraining classes. Further, CWI attempted to rework the schedule so that at least one other supervisor would be present and to minimize shifts with Schiavone. In fact, Sack even permitted Roby to skip a shift and take time off when Roby complained about having to work with Schiavone one night. Finally, Schiavone was warned that further actions would result in termination. All of these steps were more than reasonable attempts to correct the problem.

Roby nonetheless believes that CWI's actions were unreasonable because it should have acted sooner than it did. In particular, she relies upon Schiavone's "lose my job or my wife" comment to Gartzke. She believes that this comment should have alerted CWI that there was a problem at the store. However, there is no evidence that Gartzke actually knew that Schiavone was harassing Roby. At best then, the comment simply conveys that Schiavone had a romantic interest in Roby. Thus, it was not unreasonable for Gartzke, in the absence of an actual complaint or knowledge of any harassing

conduct, to infer that some unlawful activity was taking place at the store that needed to be addressed.

There remains then only the question of whether CWI has demonstrated that Roby failed to take advantage of corrective opportunities. We conclude that it has. It is undisputed that CWI had in place an anti-harassment policy that prohibited sexual harassment and included a complaint procedure. The complaint procedure required individuals to immediately report sexual harassment to a supervisor or Human Resources. Roby was clearly aware of the policy. Nonetheless, she failed to immediately report the harassing conduct and failed to say anything about it for at least five months. In fact, Roby only reported Schiavone's actions after Ziarko prompted her to do so when he overheard her speaking with Philips about Schiavone. Based on these circumstances, no rational jury could conclude that Roby's actions were reasonable. Indeed, this Court has concluded that a shorter period of delay of just four months is unreasonable. *See Jackson*, 474 F.3d at 502. Consequently, CWI's affirmative defense shields it from any liability for Schiavone's conduct and, accordingly, Roby's hostile work environment claim fails.

**B. Retaliation Claim**

A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006). Roby relies on the latter method. Under the indirect method of proof, she must establish a *prima facie*

case of retaliation by showing that: (1) she lodged a complaint about harassment; (2) she suffered a materially adverse action; (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than similarly-situated employees who did not complain. *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). If Roby can make out a *prima facie* case, the burden of production shifts to CWI to provide a legitimate, non-discriminatory reason for the adverse employment action. *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). If CWI succeeds, the burden then shifts again to Roby to demonstrate that the proffered reason is a pretext, i.e., a lie. *Id.*

Here, Roby cannot make out a *prima facie* case of retaliation. Even if she could demonstrate that similarly-situated employees were treated more favorably, a point disputed by the parties, she cannot show that she suffered an adverse employment action. Specifically, there is no evidence from which a reasonable jury could rationally conclude that CWI retaliated against Roby for reporting the conduct. Instead, CWI tried to correct the problem and accommodate Roby as much as possible given its small workforce.

Roby nonetheless argues that CWI's decision to take her off of the work schedule was an adverse employment action. Even if we accept this argument and otherwise conclude that Roby established the other elements for a *prima facie* case, CWI would still be entitled to a judgment in its favor. This is because Roby has not made a real effort to address the rest of the analysis con-

cerning whether CWI had legitimate reasons for its actions and whether those proffered reasons were simply pretext. CWI ultimately listed Roby as "off" because it concluded that she had abandoned her job by not calling to get on the schedule despite instructions to do so. Even then, CWI continued to list Roby as "active" on its payroll system until September 2007 so that Roby could return to work if she so desired. Roby made no effort to call or return to work, and she has presented no evidence suggesting that CWI's actions were a pretext. Therefore, under the circumstances, Roby's retaliation claim fails as a matter of law.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of the defendant's motion for summary judgment.