In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1347, 09-2177

TRENT L. CHAPIN,

*Plaintiff-Appellee,*

*v.*

FORT-ROHR MOTORS, INC.,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:06-CV-00034—**Theresa L. Springmann,** *Judge.*

ARGUED DECEMBER 9, 2009—DECIDED SEPTEMBER 3, 2010

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Trent L. Chapin was employed by the Bob Rohrman Auto Group as a car salesman. Following his termination at one Rohrman-owned dealership, Chapin filed a complaint with the Equal Employment Opportunity Commission, alleging that the manager discriminated against white Christians in favor of Pakistani Muslims. His new employer, a second Rohrman-owned dealership, heard about this

and threatened to fire Chapin unless the complaint was withdrawn. After this threat was made, Chapin left work and never returned, despite Fort-Rohr Motors, Inc.'s ("Fort-Rohr") repeated efforts to have him return.

Chapin sued both dealerships, alleging discrimination because of his race and retaliation under Title VII of the Civil Rights Act of 1964. After a jury trial, the jury returned a favorable verdict on Chapin's retaliation claim. Fort-Rohr appeals, arguing that it was entitled to judgment as a matter of law because Chapin failed to show that Fort-Rohr actually or constructively discharged Chapin in retaliation for his complaint. We agree that Fort-Rohr was entitled to judgment as a matter of law because Chapin did not produce sufficient evidence to support an actual or constructive discharge. Therefore, we reverse the judgment of the district court.

## I. BACKGROUND

Bob Rohrman owns multiple car dealerships in Indiana and Illinois, including several in the Fort Wayne, Indiana area. One of these is Mid-States Motors, Inc. ("Mid-States"), and another is Fort-Rohr Motors, Inc. ("Fort-Rohr").[1] The two dealerships are separate corporations with separate management and employees.

---

[1] Although the parties refer to Mid-States as "Acura" and Fort-Rohr as "Toyota" in their briefs, we will refer to them by their legal names, Mid-States and Fort-Rohr, when it is necessary to distinguish between the two.

Chapin had been employed at various Rohrman-owned dealerships in his many years as a salesman, working specifically for Larry Kruse on and off at various dealerships beginning in the early 1990s. At some point, Chapin left Indiana and spent a few years elsewhere, returning to the Fort Wayne area in the spring of 2004. Again, as he had done many times in the past, Kruse offered him a position in the spring of 2004 as a used car sales manager at Mid-States. Nadeem Baig, a Pakistani Muslim, became General Manager of the Mid-States dealership in April 2004, taking over this position from Kruse. On April 30, 2004, Baig called Chapin into a meeting and terminated Chapin's employment. During trial, Baig testified that as a new manager, he made the decision to replace Chapin because Chapin failed to be available, to train the sales force, and had failures in production. Chapin claimed he was terminated because he was a white Christian and Baig wished to replace the current employees with Pakistani Muslims.

In June 2004, Rohrman opened its Fort-Rohr dealership under the management of Kruse, who recruited and hired Chapin to work as a used car sales manager. Chapin worked without incident from July 2004 until February 2005. On February 10, 2005, Chapin filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the Mid-States dealership had discriminated against him on the basis of his race. Chapin alleged that Baig was systematically replacing white Christians with Pakistani Muslims. Mid-States's management informed Kruse about Chapin's EEOC complaint.

Kruse asked Chapin to meet with him on February 28, 2005. Also present at this meeting were Sales Manager Shane Housholder and Human Resources Manager Luke Luther. Chapin surreptitiously brought a tape recorder to this meeting and secretly recorded it. During this meeting, which only lasted a minute, Kruse raised his voice and was very upset. The recorded conversation, in transcript form, went as follows:

> KRUSE: I need to ask you, what is your mentality in filing the EEOC claim against Bob Rohrman?
>
> CHAPIN: What do you mean?
>
> KRUSE: What do I mean?
>
> CHAPIN: It is actually against Nadeem, is that correct?
>
> KRUSE: Who does Nadeem work for?
>
> CHAPIN: Rohrman.
>
> KRUSE: Who do you work for?
>
> CHAPIN: Rohrman.
>
> KRUSE: What the hell is your mentality? Did you have a brain fart or what?
>
> CHAPIN: I suppose. I didn't think that -
>
> KRUSE: Do you want to work here?
>
> CHAPIN: Yes, I do.
>
> KRUSE: If I wanted to work here on the floor, I wouldn't file suit against him.

CHAPIN: I think that I was misfairly treated down there.

KRUSE: It had nothing to do—he brought his own people in. It had nothing to do with anything with you. If you want to file a claim, you need to work somewhere else, because you are not performing here. I can let you go for non-performance.

CHAPIN: No, I want to work here.

KRUSE: Then you need to fucking reverse the claim right away, and it needs to be done today.

CHAPIN: Okay. I have to go down there.

KRUSE: Go do it right now. You aren't going to work here until you get it reversed. Period.

CHAPIN: Okay.

KRUSE: You decide if you are working here or not.

CHAPIN: All right. I am going to do it. I want to work here.

KRUSE: Go get it handled.

Following this conversation, Chapin did not withdraw his EEOC complaint, and he did not return to work. Kruse testified that he made multiple calls attempting to reach Chapin after this meeting. A woman who

lived with Chapin also testified that she had taken a message from Kruse wishing to speak to Chapin, and that she had delivered the message. Chapin denied receiving any phone calls or messages. He stated that he called Fort-Rohr to send him his February commission check but that Fort-Rohr refused to mail it until he came in for a meeting.

On March 4, 2005, Chapin met again with Kruse, Housholder and Luther, and again, secretly taped the meeting. As compared to the first tape-recording, this tape-recording was considerably less clear and the transcript is not verbatim. A transcribed version of the relevant parts of the conversation states:

> KRUSE: What is going on?
>
> . . .
>
> CHAPIN: You told me, don't come back unless I reversed it. That is your exact words. You made it very clear.
>
> KRUSE: I didn't tell you that.
>
> CHAPIN: Yes, you did. You said, until I can clear that, I didn't have a job.
>
> KRUSE: —I didn't fire you, if that is what—
>
> CHAPIN: I took it as me being fired. You said I didn't have a job.
>
> KRUSE: I didn't fire you.
>
> . . .
>
> KRUSE: I suggest that you go get dressed and report back to work.

. . .

CHAPIN:   I was under the impression that you didn't want me up here.

KRUSE:    That is not the—.

CHAPIN:   That was the total impression. You said I was going to get fired for production.

KRUSE:    I didn't say anything about getting fired.

CHAPIN:   You said, "I could fire you."

KRUSE:    I said I could fire you. I didn't say I was firing you.

. . .

KRUSE:    So, my question is, do you want to work here?

CHAPIN:   I do. I need a little time off.

KRUSE:    Time off?

CHAPIN:   I am in the middle of a painting project, and I want to get it done.

Following this conversation, Fort-Rohr sent several letters to Chapin. One dated March 8, 2005 states that "you clearly understood that you are still employed with us and expected to be at work" and that "you would be able to return to work." Another letter dated March 14, 2005 states that "[d]espite numerous attempts to contact you by mail as well as by phone, we have failed to receive any response from you regarding your

intentions to continue your employment with us." Chapin also acknowledges receiving a letter dated March 18, 2005 from Luther indicating that he still had a position at Fort-Rohr. Chapin never formally resigned his position or returned to work.

Chapin filed this lawsuit, alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and a jury returned a verdict in favor of Mid-States on Chapin's reverse discrimination claim. It also found for Chapin on his retaliation claim, awarding him $100,000 in compensatory damages and $1,000,000 in punitive damages. After the trial, the district court denied Fort-Rohr's motion for judgment as a matter of law, and Fort-Rohr appealed.

## II. ANALYSIS

We review de novo the district court's denial of a motion for judgment as a matter of law under Rule 50(b). Fed. R. Civ. P. 50(b); *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir. 2008). We construe the facts in favor of the party who prevailed before the jury, and we will only overturn a jury verdict for the plaintiff if we conclude that no rational jury could have found for the plaintiff. *Tate*, 546 F.3d at 532.

At trial, Chapin presented two alternatives to the jury as to how Fort-Rohr retaliated against him for filing his EEOC complaint—that Fort-Rohr either actually or constructively terminated his employment. The jury was

instructed that Chapin could succeed on his claim only if he proved by a preponderance of the evidence that Fort-Rohr "either directly or constructively discharged him for filing a charge of discrimination." Fort-Rohr argues that it was entitled to judgment as a matter of law because Chapin did not establish that Fort-Rohr actually or constructively discharged Chapin in retaliation for making his EEOC complaint of discrimination. Title VII prohibits an employer from taking an adverse employment action against an employee simply because he has filed an unfair employment charge. 42 U.S.C. § 2000e-3(a); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). The antiretaliation provision prohibits employers from taking actions that would be likely to deter victims of discrimination from complaining to the EEOC. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Under the direct method of proof, to establish a prima facie case of retaliation, the plaintiff was must show that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal link between the two. *Id*. While Chapin proceeds under the direct method of proof, a materially adverse action is required in the indirect method of proof as well. *Id.*

## A. Chapin Was Not Actually Terminated

The parties agree that Chapin engaged in a protected activity because he filed a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-3(a). The primary issue in this appeal is whether any adverse employment

action was taken against Chapin because of his complaint. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. To determine if an action is "materially adverse," we ask whether the action would dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* at 68; *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009). In determining the significance of any given act of retaliation, the test is objective but "context matters" and we look at the "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used . . . ." *Burlington Northern*, 548 U.S. at 69; *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

As an initial matter, Chapin claims he was actually fired on February 28, 2005, and that this firing establishes an adverse action. The quintessential example of an adverse action is a tangible employment action, such as the termination of the employment relationship. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Chapin argues that the jury could have reasonably concluded that, because he did not withdraw his EEOC complaint after his meeting with Kruse, Chapin was then immediately and automatically fired. If Chapin had filed suit on February 28 after his meeting with Kruse, and all we had to analyze was his first tape-recorded conversation with Kruse, Chapin could plausibly argue that it was a question of fact

whether he was actually fired. But here, where several exchanges occurred after February 28, we would need to look at the February 28 events in a vacuum and ignore all subsequent actions of the parties to conclude that there was an actual termination.

The sequence of events was as follows: Kruse became aware that Chapin filed an EEOC charge, and he asked Chapin to meet with him. During this short, heated meeting, Kruse asked him why he would file an EEOC claim and then stated that if Chapin wanted to work on the floor, he would need to withdraw the claim. Chapin responded by saying that he did want to work there and he would withdraw his claim. Chapin left work that day, but did not withdraw his claim.

Chapin claims that he was automatically terminated as soon as he left work on February 28 because the withdrawal of the EEOC claim was a precondition to him keeping his job. However, the actions of Fort-Rohr when Chapin did not return to work, show that an automatic termination never occurred. Kruse and Fort-Rohr did not consider Chapin to be fired and Kruse actively and continually encouraged Chapin to return to work. Most importantly, Chapin himself testified that his understanding from the February 28 meeting was that "I assumed Kruse would fire me if I didn't reverse the claim, which I did not," and not that he was terminated at the meeting itself. Furthermore, Chapin returned to Fort-Rohr on March 4, 2005 to pick up his commission check because Fort-Rohr refused to mail it to him without having him come in for a meeting.

During this meeting, Chapin acknowledged that he was still employed by Fort-Rohr and claimed to want to return to work once he was done with a painting project. Kruse never fired Chapin, and so an actual termination from Fort-Rohr cannot be the basis of Chapin's retaliation claim. Based on the record and evidence produced at trial, no rational juror could have found that Kruse actually fired Chapin on February 28.

### B.   No Constructive Discharge

In the alternative, Chapin claimed that he was constructively discharged from his employment, and that this constructive discharge provides the basis of his retaliation claim. A constructive discharge constitutes an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004*)*. It occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable. *Id.* at 147; *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); *see also EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). Our circuit has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable. *See Pa. State Police*, 542 U.S. at 141 ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."); *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004); *Univ. of Chi. Hosps.*, 276 F.3d at 332.

In the first form, an employee resigns due to alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, *Roby*, 579 F.3d at 785, thereby allowing an employer to address a situation before it causes the employee to quit. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007). For example, we have found constructive discharge when there is a threat to a plaintiff's personal safety. *See, e.g.*, *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment includes repeated use of noose and implied threats of physical violence); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge where supervisor brandished a firearm and held it to the plaintiff's head). Chapin can have no success under this form of constructive discharge, as he has not suggested he has suffered any harassment. One threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for Chapin's constructive discharge claim. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).

The second form of constructive discharge we have recognized occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated. . . ." *Univ. of Chi. Hosps.*, 276 F.3d at 332. In this situation, if the plaintiff employee resigns, the employer's conduct may

amount to constructive discharge. *Id.* This form of constructive discharge, however, does not eliminate the need for the plaintiff to show that his working conditions had become intolerable. *Id.*; *Cigan*, 388 F.3d at 333. And a working condition does not become intolerable or unbearable merely because a "prospect of discharge lurks in the background." *Cigan*, 388 F.3d at 333.

In *EEOC v. University of Chicago Hospitals*, we ruled that a claim of constructive discharge could move forward to trial where an employee, Victoria Leyva, arrived at work to find her belongings packed and her office being used as storage. 267 F.3d at 332. In that case, the packing of belongings came after a supervising employee was fired for refusing to fire Leyva, Leyva received suddenly negative performance evaluations, and she was told a minor mistake was "the last straw." *Id.* at 329-30. We similarly found a constructive discharge in another case, where it was undisputed by both parties that had the employee not resigned he would have been terminated immediately. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 502 (7th Cir. 2010). In contrast, we found there was no constructive discharge where an employee was asked derisively about her motives for filing an EEOC claim, the employer required the employee to transfer offices or move, and only offered one unattractive transfer option, among other claims. *Fischer*, 519 F.3d at 410. We also observed that the employee may have been able to survive summary judgment if she stayed in her transferred position long enough to show that it truly was a dead-end path towards termination. *Id.* at 411.

Here, even construing all the evidence in Chapin's favor, no reasonable employee standing in Chapin's shoes would believe that had he not resigned, he would have been immediately fired. Unlike in *University of Chicago Hospitals*, there is nothing to indicate that a firing here was an imminent and inevitable event. This is not a situation where the "handwriting was on the wall" and the plaintiff quit "just ahead of fall of the axe." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998). Instead, Chapin quit after the axe had been put away. On February 28, 2005, Chapin may have had ample reason to believe his termination to be imminent—Kruse threatened to fire him and very clearly tied that threat to his EEOC complaint. But, Chapin had no reason to continue to believe that after his subsequent and multiple contacts with Fort-Rohr. Fort-Rohr made efforts to have Chapin return to work, explained that Chapin's employment was not terminated, and expressed a desire to keep Chapin on as an employee. At that point, Chapin's decision not to return to work was his own: he had a painting project to finish. *Cf. Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005) (stating that a person who leaves employment because of a distaste or impatience for investigation or termination procedures voluntarily resigns and is not compelled to resign).

In fact, Chapin never formally resigned and indeed just never returned to work. If Chapin had returned to work, without having withdrawn the EEOC charge, perhaps Kruse would have fired him. Or, his supervisors or co-workers may have constantly harassed him to the point where his safety was at risk. *See Boumehdi*, 489 F.3d at 790.

Kruse may also have done nothing. Any of these possibilities would require speculation on our part, as would a finding that the workplace would have become intolerable if Chapin had resumed his position, because Chapin unilaterally gave up his position. Chapin himself asks us to speculate when he argues that "constructive discharge *would have occurred* given the setup created by Kruse under the pretext of nonperformance." Appellee's Br. at 8 (emphasis added). In *Cigan*, we emphasized that it is not a court's position to speculate on "what ifs," stating that "[t]he only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened . . . is a poor substitute for the actual results of real deliberation within the employer's hierarchy." *Cigan*, 388 F.3d at 333-34. This is particularly true in the constructive discharge context, where we recognize that the burden remains on the employee to show why he would have had to "quit immediately, before he found the other job; why, in other words, his duty to mitigate damages did not require him to remain." *Lindale*, 145 F.3d at 956; *see Boumehdi*, 489 F.3d at 790.

To find that one singular threat, followed by multiple reassurances that the employee has retained his job, was a constructive discharge is to lower the threshold of the "intolerable" workplace so far as to be unrecognizable. A reasonable person in Chapin's position would not have felt that he had no choice but to resign. No rational jury could have concluded that Fort-Rohr constructively discharged Chapin. Because there was no adverse action under either of the theories Chapin pre-

sented to the jury, Chapin's retaliation claim under Title VII fails and we reverse the district court's denial of Fort-Rohr's motion for judgment as a matter of law.[2]

### III. CONCLUSION

We REVERSE the jury verdict and REMAND the case to the district court to enter judgment as a matter of law for Fort-Rohr Motors, Inc. Because we reverse the jury verdict, we do not reach the remaining issues in the appeal.

---

[2] We briefly note that we do not foreclose the possibility that a plaintiff could argue that a singular threat of termination had the impact of dissuading a reasonable worker from supporting a discrimination complaint, which might act as the necessary adverse action underlying his retaliation claim. *See, e.g., Pantoja v. Am. NTN Bearing Mfg.*, 495 F.3d 840, 849 (7th Cir. 2007) (allowing warnings of termination or other adverse actions to proceed to jury); *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 624 (7th Cir. 2002) (suggesting that a threat to fire would be an actionable "anticipatory retaliation."). *But see Dunn v. Washington County Hosp.*, 429 F.3d 689, 690 (7th Cir. 2005) (stating that one unfulfilled threat could not be actionable and finding that "nasty" requests to withdraw a complaint did not cause injury). Neither here or at the district court has either party explored this possibility, and we decline to do so as well. *See Ocean Atlantic Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 1005 (7th Cir. 2003).