In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 22-1966

MELISSA MYERS,

*Plaintiff-Appellant,*

*v.*

SUNMAN-DEARBORN COMMUNITY
SCHOOLS and KELLY ROTH,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:20-cv-00049-SEB-DML — **Sarah Evans Barker**, *Judge.*

———————————

ARGUED JANUARY 12, 2023 — DECIDED JULY 1, 2025

———————————

Before SYKES, *Chief Judge*, and EASTERBROOK and RIPPLE,
*Circuit Judges*.

SYKES, *Chief Judge*. For many years Melissa Myers served
as an instructional aide at an elementary school in the Sun-
man-Dearborn Community Schools. When her husband
died, grief disrupted her work, so she took a leave of ab-
sence under the Family and Medical Leave Act ("FMLA") at
the end of the 2017–2018 school year. Myers returned to

work for the 2018–2019 school year, but in the first two months she accumulated absences exceeding the limit of her paid leave days. She had also exceeded her allotted leave time in the 2017–2018 school year before taking FMLA leave. The school principal warned Myers that she needed to improve her attendance or face the prospect of termination.

Myers resigned and then sued the school district and the principal alleging violations of her rights under the FMLA, the Americans with Disabilities Act ("ADA"), and the Fourteenth Amendment's Equal Protection Clause. The district court entered summary judgment for the defendants.

Myers appealed, but she lacks evidence to support any viable theory of relief. She was neither eligible nor had a condition qualifying for FMLA leave in the weeks preceding her resignation, and she did not give the school district notice that she intended to take statutory leave. She tries to recast her claim as one for "anticipatory retaliation," but that theory fails for similar reasons: she has no evidence that she could or would take FMLA leave at the start of the 2018–2019 school year, and the evidence is insufficient to show that the principal punished her for taking leave the year before. The ADA claim cannot succeed because Myers was not subjected to an adverse employment action. She argues that she suffered a constructive discharge, but her working conditions were not objectively intolerable and termination was neither imminent nor unavoidable. The equal-protection claim likewise fails for lack of proof. We therefore affirm.

## I. Background

From 2001 until her resignation in the fall of 2019, Myers was employed as an instructional aide at Bright Elementary

School in the Sunman-Dearborn Community Schools in southeastern Indiana. By all accounts her employment was trouble free until the 2017–2018 school year. In May 2017 Myers's husband died unexpectedly. Her mother, who had lived with Myers and her husband, had died two years earlier, and Myers struggled with depression from the combined effect of her losses. For these and other reasons, she was absent 25.5 days during the 2017–2018 school year—14.5 days more than the 8 paid sick days and 3 paid personal days that she was entitled to each year. Myers eventually applied for FMLA leave, which was approved from March 1 to April 16, 2018, and then extended through the end of the school year.

Myers returned to work at the start of the 2018–2019 school year, but her absences again piled up. By the beginning of November—a little over two months into the school year—she had used all 11 of her paid leave days and an additional 6 days of unpaid leave. She attributes these absences to bouts of pneumonia, bronchitis, and strep throat.

At the beginning of that school year, Kelly Roth became the principal at Bright Elementary. Myers claims that when the two met on the first day of school in August 2018, Roth remarked, "Oh, … you're Missy Myers, I've heard a lot about you, you have problems at home." Myers claims that in the weeks that followed, Roth encouraged her to seek counseling and once suggested that she should consider leaving Bright Elementary and instead open her own craft business. Myers also claims that she twice found a brochure for counseling services in her school mailbox. Roth insists that she did not place the brochures there but admits that she mailed an Employee Assistance Program pamphlet to

Myers because she had suffered a tragic event and Roth believed that the program offered helpful resources to employees.

The issue of Myers's frequent absences came to a head in November. Myers claims that Roth approached her in the hallway on Friday, November 9, and said "in a harsh tone": "If you miss one more day, I'm going to terminate you." (Recall that by this point Myers had exceeded her paid-leave allotment by 6 days.) Myers also contends, however, that Roth promised not to write her up for her previous absences.

Despite that assurance, on the following Monday—November 12—Roth issued the following written warning to Myers:

> I am writing to express my concern regarding your excessive absences at work. According to my documentation, you missed 14.5 days, in addition to the allotted 11 sick and 3 personal days (totaling 25.5 days) in the 2017-2018 school year.[1] You have missed your allotted 8 sick and 3 personal days, and an additional 6 unpaid days (totaling 17 days) to date in the 2018-2019 school year. Your position is a valuable asset to student learning. Because of this, I expect to see a drastic improvement in attendance or you will be at risk of termination due to excessive absences.

---

[1] The warning incorrectly states that Myers exceeded the school district's allotted 11 paid sick days instead of the allotted 8 paid sick days and 3 paid personal days—for a total of 11 days of approved paid leave.

Myers resigned the next day. In February 2020 she sued the Sunman-Dearborn Community Schools and Kelly Roth alleging that they interfered with her FMLA rights and discriminated against her under the ADA. She also brought a claim under 42 U.S.C. § 1983 alleging that the defendants violated her Fourteenth Amendment right to equal protection.

Following discovery, the defendants moved for summary judgment on all claims. The district judge granted the motion, explaining that Myers's claim for interference with her FMLA rights failed because she did not have a condition entitling her to FMLA leave nor had she notified school officials of her intent to take such leave. Myers argued in the alternative that her FMLA interference claim could be construed as one for "anticipatory retaliation." The judge reasoned that any retaliation theory also failed because the evidence did not suggest that Roth had reason to believe that Myers would use FMLA leave or punished her for her use of FMLA leave the year before. Turning to the ADA claim, the judge explained that the evidence was insufficient to show that Myers was constructively discharged. And the equal-protection claim could not proceed because Myers had not identified any similarly situated school employee who was treated more favorably. The judge accordingly entered summary judgment for the defendants across the board.

## II. Discussion

We review the summary judgment de novo, construing the evidence in the light most favorable to Myers as the nonmoving party. *Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023). Summary judgment is appropriate when the material facts are undisputed and the moving party is

entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Not all factual disputes are material: to defeat an opponent's motion for summary judgment, the nonmoving party must produce sufficient evidence to permit a jury to return a verdict in his favor on the essential elements of his claim. *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022).

Myers argues that she produced enough evidence to proceed to a jury trial on each of her claims. We disagree.

## A. FMLA Claim

The FMLA entitles an eligible employee to take up to 12 weeks of leave from work each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. *Id.* § 2615(a)(1). Retaliation for exercising FMLA rights is also prohibited. *See id.* § 2615(a)(2); *see also Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023). An interference claim requires proof that the employer interfered with, restrained, or denied an employee's exercise of FMLA rights to which he was entitled; proof of discriminatory intent is not necessary. *Id.* "A retaliation claim, in contrast, 'requires proof of discriminatory or retaliatory intent.'" *Id.* (quoting *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012)).

Myers does not always clearly distinguish between her interference and retaliation theories of liability. Her arguments overlap and sound in both theories. She claims that Roth's threat to fire her if she continued to miss work and the subsequent written warning prevented her from apply-

ing for future FMLA leave. She also contends that Roth issued the warning in "anticipatory retaliation" for any future leave-taking or in retaliation for her use of leave during the 2017–2018 school year.

To prevail on a claim for interference with her FMLA rights, Myers had the burden to establish the following five elements: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer "interfered with, restrained, or denied FMLA benefits to which he was entitled." *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022). Myers's evidence falls far short of establishing these elements.

Start with eligibility: the FMLA defines an "eligible employee" as "an employee who has been employed … for at least 12 months by the employer" and who has "at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). We've explained that "the statutory text is perfectly clear": FMLA leave rights are "conferred *only* on employees who have worked at least 1,250 hours in the previous 12 months." *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 206 (7th Cir. 2008) (internal quotation marks omitted). Although Myers had been employed by the school district for many years, she worked only 705 hours in the 12-month period prior to Roth's oral and written warnings. Indeed, Myers concedes her noneligibility, acknowledging that "she had not applied for FMLA *nor was she eligible for FMLA*" when she resigned. (Emphasis added.)

That defeats her claim. In the interest of completeness, however, we note that Myers also failed to show that she had a serious health condition entitling her to take FMLA leave. § 2612(a)(1)(D). The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves … inpatient care in a hospital, hospice, or residential medical care facility[,] or … continuing treatment by a health care provider." § 2611(11). Myers had previously struggled with depression after the deaths of her mother and husband, but she does not claim that this condition interfered with her ability to work during the 2018–2019 school year. On the contrary, she agrees that she had recovered well enough to return to work at the start of the 2018–2019 school year and instead attributes her frequent absences to discrete bouts of pneumonia, bronchitis, and strep throat—in addition to "a low immune system," thyroid disease, and arthritis. She has made no effort, however, to connect these illnesses to the statutory standard for a qualifying health condition.

Finally, there is no evidence that Myers gave the school district notice of her intent to take FMLA leave. Myers points to the fact that she called in sick multiple times and sometimes supplied doctor's notes. But merely calling in sick "is insufficient to put the employer on notice that the employee may qualify for FMLA leave." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 366 (7th Cir. 2020). And the doctor's notes were nothing more than generic templates asking the school district to "[p]lease excuse Melissa L. Myers … from work/school" and stating that she had "[n]o limitations" on activity. None of these notes even hinted that Myers might need FMLA leave. *See de la Rama v. Ill. Dep't of Hum. Servs.*, 541 F.3d 681, 687 (7th Cir. 2008) (explaining that notice is not

sufficient under the FMLA "if the [doctor's] note does not convey the seriousness of her medical condition").

As we've noted, Myers tries to recast her FMLA claim under a theory of "anticipatory retaliation." A retaliation claim generally requires proof that the plaintiff engaged in FMLA-protected activity and that the employer acted with discriminatory or retaliatory intent. *Nicholson*, 690 F.3d at 828. We have not explicitly endorsed a theory of "anticipatory retaliation" in this context. That makes sense: an FMLA interference claim provides employees with a cause of action against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" their statutory rights. *See Ziccarelli*, 35 F.4th at 1084.

Even if the concept of "anticipatory retaliation" is a distinct and viable theory of FMLA liability (an issue we do not decide today), Myers has no claim. To repeat, she has not shown that she either could or intended to use FMLA leave when Roth warned her to improve her attendance. And to the extent that Myers's retaliation theory rests on a claim that she was constructively discharged, her evidence is woefully insufficient for reasons we will explain next in connection with our analysis of the ADA claim.

## B. ADA Claim

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To prevail on her ADA claim, Myers had the burden to prove that that "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse

action was caused by her disability." *Brooks v. Avancez*, 39
F.4th 424, 433 (7th Cir. 2022). Myers does not argue that she
was disabled in the fall of 2018 when Roth warned her to
improve her attendance; she argues instead that Roth im-
permissibly "regarded" her as disabled, which is an alterna-
tive basis for ADA liability. 42 U.S.C. § 12102(1)(C). And
because the school district did not fire her—she resigned—
the ADA claim rests on a theory of constructive discharge.
It's on this last point that Myers's claim is most obviously
deficient.

"Under the constructive discharge doctrine, an employ-
ee's reasonable decision to resign because of unendurable
working conditions is assimilated to a formal discharge for
remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129,
141 (2004). In *Suders* the Supreme Court framed the doctrine
succinctly: "The inquiry is objective: Did working conditions
become so intolerable that a reasonable person in the em-
ployee's position would have felt compelled to resign?" *Id*.
As the Court explained, if a plaintiff is subjected to severe or
pervasive unlawful harassment in the workplace—in *Suders*
it was sexual harassment—and the hostile environment
creates such intolerable working conditions that a reasonable
person would feel compelled to resign, then the plaintiff's
resignation amounts to a constructive discharge, which "is
functionally the same as an actual termination." *Id*. at 147–
48.

Our cases sometimes refer to two forms of constructive
discharge, "but neither dispenses with the requirement that
the work environment had become intolerable." *Chapin v.
Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The
first form involves an employee who resigns in response to

unlawful discriminatory harassment; these cases require evidence of working conditions "even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citation omitted).[2] This understanding of constructive discharge aligns with *Suders*.

We have also said, however, that "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002); *see also Chapin*, 621 F.3d at 679. Importantly, however, we have emphasized that this form of constructive discharge "does not eliminate the need for the plaintiff to show that his working conditions had become intolerable." *Id.* at 679. Indeed, retaining the requirement of objectively intolerable working conditions is necessary to

[2] Myers argues on appeal that the district judge "overlooked" her standalone claim against the defendants for subjecting her to a hostile work environment. Not so. Myers never mentioned such a claim below; rather, her only reference to a "hostile work environment" in her summary-judgment brief was to describe the test for constructive discharge. We have squarely rejected attempts to raise claims of a hostile work environment for the first time on appeal. *See, e.g., Hackett v. City of South Bend*, 956 F.3d 504, 509 (7th Cir. 2020) (explaining that the conduct underlying a retaliation claim and a hostile-environment claim may overlap in the employment-discrimination context, but "the[y] are legally distinct theories" and "a plaintiff needs to spell out these distinct theories separately" to give "the district judge fair notice that the theory is being asserted").

conform to the Supreme Court's articulation of the doctrine in *Suders*. Moreover, an employee's working conditions do "not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Id.* (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)).

Properly understood, the constructive-discharge doctrine does not help Myers here. No evidence suggests that she suffered serious or persistent harassment based on an actual or perceived disability, much less that her working conditions were objectively intolerable. Her anodyne and infrequent run-ins with Roth do not suffice under the objective test. Nor is there sufficient evidence to establish that Myers "immediately and unavoidably [would] be terminated," *Ziccarelli*, 35 F.4th at 1091 (quotation marks omitted). She risked being fired if she did not improve her attendance, but that does not amount to an imminent and unavoidable termination. Because the evidence falls far short of what's needed to establish a constructive discharge, Myers's ADA claim fails.

## C. Equal-Protection Claim

We close by briefly addressing Myers's equal-protection claim, which never really got off the ground because she produced no evidence that she was treated differently from others similarly situated. *See Smith v. City of Chi.*, 457 F.3d 643, 650–51 (7th Cir. 2006) (outlining the requirements for a plaintiff to prove an equal-protection claim). Myers made no effort to identify any similarly situated employee who was treated more favorably. Instead, she relied entirely on Roth's deposition testimony in which she was asked if other instructional aides ever exceeded their allotted sick days. Roth

replied: "Yes, you'll have that. In administration, I've seen that happen. They'll go a few days over, but it's not typical to run out of days in October." That's far from sufficient to satisfy Myers's burden on the constitutional claim.[3]

AFFIRMED

---

[3] In a final argument, Myers raises a brief procedural challenge to the district judge's decision to strike portions of her surreply to the defendants' summary-judgment motion. Under the district court's Local Rule 56-1(d) "[a] party opposing a summary judgment motion may file a surreply brief *only if the movant cites new evidence in the reply* or objects to the admissibility of the evidence cited in the response. The surreply … *must be limited to the new evidence* and objections." (Emphases added.) As we have said many times, "district courts may require strict compliance with their local rules." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020). District judges have wide latitude to interpret and apply their local rules in individual cases; our review is highly deferential, for abuse of discretion only. *Id*. There was no abuse of discretion here. The judge applied the local rule and made a reasonable judgment about which portions of Myers's surreply did not conform to its terms.