In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2238

DONNA NICHOLSON,

*Plaintiff-Appellant,*

*v.*

PULTE HOMES CORPORATION and
CHRIS NAATZ, individually,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10-cv-833—**John W. Darrah**, *Judge.*

ARGUED DECEMBER 6, 2011—DECIDED AUGUST 9, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Donna Nicholson was a sales associate for Pulte Homes Corporation, a national homebuilder. When she failed to make her sales quotas for several months in a row, Pulte put her on a performance-improvement plan and later fired her when her sales did not improve. Nicholson claimed that her termination was related to her need to care for

her ailing parents. She sued Pulte under the Family and Medical Leave Act ("FMLA" or "the Act"), 29 U.S.C. §§ 2601 *et seq.*, alleging that the company interfered with her statutory rights and retaliated against her in violation of the Act. The district court granted summary judgment for Pulte on both claims.

We affirm. Nicholson did not put Pulte on adequate notice that she needed FMLA-qualifying leave to care for her parents. At most, she made a few casual comments to her supervisors about her parents' ill health. Moreover, at the time the decision to terminate her employment was made, she had asked for only a single day off to attend a doctor's appointment with her father, which her supervisor allowed. Accordingly, Nicholson has not presented sufficient evidence that Pulte interfered with her rights under the FMLA. Her retaliation claim fails for the same reasons and also because there is no evidence that Pulte imposed the performance-improvement plan or terminated her employment as punishment for taking leave.

## I.  Background

Nicholson began work as a sales associate for Pulte Homes in 1999. At all relevant times, her supervisors were Maria Wilhelm and Chris Naatz. Pulte explained its FMLA-leave procedures in its employee handbook, which included the following provision regarding how to give notice of the need for leave:

> You must request leave from Human Resources, not your manager or anyone else. Employees must

provide 30 days['] advance notice of the need to take FMLA leave when the need is foreseeable. Employees must provide sufficient information for the Company to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave . . . [.] Employees will be required to provide a certification . . . supporting the need for leave.

Nicholson understood that the handbook applied to her.

In 2005 Nicholson's father was diagnosed with leukemia. His condition progressively deteriorated thereafter, but he lived independently and generally took care of himself. Occasionally, Nicholson attended a doctor's appointment with her father (five times or so in four years) to help him remember information. Nicholson's mother lived with her but did not require in-home care. Nicholson administered her mother's medication, reminded her to eat (she could fix simple meals on her own), paid her bills, and attended some doctor's appointments with her mother on her days off (though her mother was able to drive and run basic errands on her own). At some point—Nicholson could not remember exactly when—her mother was diagnosed with chronic kidney disease.

In 2007 Pulte placed Nicholson on a performance-improvement plan for failing to meet her monthly sales goals. She continued to struggle in early 2008, receiving an evaluation from Wilhelm that focused on her need to achieve greater consistency in meeting her monthly goals. Wilhelm also noted Nicholson's need to improve her poor attitude, which was causing her sales to suffer.

In December 2008 Nicholson first spoke of her father's condition to Wilhelm. Specifically, Nicholson mentioned that she might need time off in the first quarter of 2009 due to her father's possible need for chemotherapy. Wilhelm offered to do anything she could to help. Nicholson testified in her deposition that the matter was "left open-ended" because of the uncertainties surrounding her father's need for treatment.

On February 15, 2009, Nicholson received another performance evaluation from Wilhelm, this time noting that when Nicholson maintained a positive attitude and sustained effort, she was capable of being a successful salesperson, and emphasizing the need for consistency in her performance. In a follow-up email, Wilhelm reminded Nicholson of the importance of making her sales goals every month, saying that "[c]onsistency will be extremely important as it was in 2008." Also in February, Wilhelm became concerned that Nicholson was not properly managing buyers' expectations. In March Pulte received two customer complaints about Nicholson. One stated that "Donna . . . is rude, condescending and unprofessional," and "I will not be buying a Pulte home from you because of Donna." Another customer reported that she hung up on Nicholson out of frustration with her unwillingness to wrap up a conversation. Then, during an important field-operations meeting, Nicholson was unable to answer questions pertaining to her sales area, leading Naatz to question her knowledge, preparedness, and attitude. Wilhelm raised these concerns with Nicholson and asked her to acknowledge them by return email. Nicholson did so.

That same month Nicholson had a "casual conversation" with Naatz and other Pulte employees about the challenges of dealing with aging parents and alluded to her father's illness. Naatz recalled only that Nicholson mentioned wanting to downsize her home because too many people were living with her. Nicholson never said anything else to Naatz about her parents' health.

In March or April, Nicholson's mother experienced a significant weight loss. Shortly thereafter, Nicholson mentioned her mother's condition to Wilhelm for the first time. Specifically, Nicholson told Wilhelm that she was driving her mother to medical appointments on her days off to minimize interference with her work schedule. Wilhelm again offered to do anything she could to help.

On April 25 Nicholson asked Wilhelm for permission to take April 27 off to attend a doctor's appointment with her father to help him understand and retain his doctor's advice. Wilhelm gave Nicholson the day off but rescheduled a mandatory meeting that had been planned for that day to a time before normal business hours to avoid a conflict with the medical appointment. After the appointment, Nicholson told Wilhelm that her father's diagnosis had worsened to stage III cancer.

Nicholson did not make a single sale during the month of April. In response, and also based on concerns about the customer complaints and Nicholson's lack of knowledge during the field-operations meeting, Naatz asked Wilhelm to prepare a performance-improvement plan for Nicholson. On May 5 Naatz and Wilhelm gave

Nicholson a written warning and performance-improvement plan that identified her poor attitude and failure to make her sales goals as areas of deficiency. The plan established a modest goal of two net sales in both May and June. Although Pulte's performance-improvement plans were normally 30 days in duration, the company gave Nicholson 60 days based on her longevity with the company. But she was also told that her performance would be assessed beginning May 31 and that her employment might be terminated before the plan expired if she did not make sufficient progress. When she received the performance-improvement plan, Nicholson told Wilhelm that she could not work outside her normal hours because of her responsibilities to her parents. But she did not say she anticipated a need for time off. At Wilhelm's request Nicholson sent another email to Naatz confirming that she understood the company's concerns about her lagging performance.

Nicholson made no sales at all during May and June. On June 22 Naatz, Wilhelm, and a company executive decided to terminate Nicholson's employment. Naatz and Wilhelm testified that the termination decision was made before Nicholson's performance-improvement plan expired because she had not shown any improvement in her attitude or effort and did not make any sales. They did not notify Nicholson of their decision that day, however. Instead, they delayed meeting with Nicholson for two days—until June 24, the end of her workweek—so they could arrange coverage at Nicholson's sales office.

On the morning of June 23, Nicholson contacted Wilhelm to tell her that she would not be in that day because she had to take her mother to the emergency room. Wilhelm excused Nicholson from work and notified Naatz and an administrative assistant that Nicholson was taking a personal day off. The next afternoon Nicholson received a call from the hospital about her mother; at about 3 p.m., she asked Wilhelm for permission to leave work to attend to her mother in the hospital. Wilhelm agreed. At the end of that day—June 24—Wilhelm went to Nicholson's office to notify her of the termination decision. She did not give Nicholson a specific reason for the termination. But Nicholson testified that at the time she assumed that she was fired for failing to meet the terms of her performance-improvement plan.

Sometime later, Nicholson's former sales partner Juan Chaidez asked Wilhelm about Nicholson's termination. Wilhelm told him she could not discuss the reasons for the termination. At some point during this conversation, Wilhelm mentioned that Nicholson had "some personal family matters to attend to." She did not say, however, that Nicholson's parents' medical conditions played any role in the termination decision.

Nicholson sued Pulte and Naatz alleging that they interfered with her FMLA rights and retaliated against her in violation of the Act. The district court granted Pulte's motion for summary judgment on both claims. The court held that Nicholson's interference claim failed because she provided insufficient notice of her intent

to take FMLA leave. The court rejected the retaliation claim for essentially the same reason, concluding that because Nicholson never engaged in FMLA-protected activity, she could not prevail on a claim of retaliation.

## II. Discussion

Nicholson's appeal rests primarily on her contention that the district court impermissibly construed the factual record in Pulte's favor instead of hers. We review the court's summary-judgment ruling de novo, construing all facts and reasonable inferences in the light most favorable to Nicholson, the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). Summary judgment is appropriate when the material facts are undisputed and the moving party is entitled to judgment as a matter of law. *Id.*

The FMLA permits an eligible employee to take up to 12 weeks of leave per year "to care for . . . [a] parent [with] a serious health condition." 29 U.S.C. § 2612(a)(1)(C). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. *Id.* § 2615(a)(1). Nor may an employer retaliate against an employee for exercising FMLA rights. *See id.* § 2615(a)(2) (prohibiting "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter"); *id.* § 2615(b) (making it unlawful for any employer to discharge or discriminate against anyone for exercising rights under the FMLA); *see also*

*Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005) ("We have construed [§ 2615(a)(2) and (b)] to create a cause of action for retaliation."). An interference claim requires proof that the employer denied the employee FMLA rights to which she was entitled; a retaliation claim requires proof of discriminatory or retaliatory intent. *Goelzer v. Sheboygan County, Wis.,* 604 F.3d 987, 995 (7th Cir. 2010); *Kauffman,* 426 F.3d at 884-85.

## A. FMLA Interference

To prevail on an FMLA interference claim, an employee must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her the right to FMLA benefits. *Burnett v. LFW Inc.,* 472 F.3d 471, 477 (7th Cir. 2006). Here, the focus is on the fourth and fifth elements: whether Nicholson provided sufficient notice to Naatz or Wilhelm of her intent to take FMLA-qualifying leave and whether Pulte denied her FMLA benefits to which she was entitled.[1]

---

[1] Pulte also disputes the third element and argues that Nicholson did not establish her entitlement to FMLA leave in the first place. It is undisputed that Nicholson's father had stage III cancer and her mother was ultimately diagnosed with kidney disease. FMLA regulations explicitly list both of these diagnoses as "serious health conditions." *See* 29 C.F.R.

(continued...)

Pulte first argues that the interference claim fails because Nicholson did not follow the company's internal notice procedures. It is true that FMLA regulations generally permit an employer to enforce notice and other procedural requirements for invoking FMLA leave: "An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302(d). Accordingly, we have held that an employee's failure to comply with an internal leave policy is a sufficient ground for termination and forecloses an FMLA claim. *See Righi*, 632 F.3d at 411-12 (citing cases). Pulte requires its employees to notify the human-resources department—not just a supervisor—of their need for FMLA

---

(...continued)

§ 825.115(e)(2). Pulte claims that the regulations further require that the employee certify that the family member is "unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or [be] unable to transport himself or herself to the doctor." *Id.* § 825.124(a)*.* The regulation in question is illustrative only; it describes the kinds of situations in which employees might be needed to care for family members and may use FMLA leave. Here, Nicholson went with her father to a medical appointment to help him retain information and instructions from his doctor. On her days off, she also attended doctor's appointments with her mother, who was less independent and needed more assistance. A reasonable jury could find that Nicholson qualified for FMLA leave to care for her parents.

leave. Nicholson did not do so and therefore failed to comply with Pulte's internal leave policy.

But unlike in *Righi*, Pulte was not terminated for excessive absenteeism or failure to follow FMLA leave procedures. She was terminated for performance problems. On the two occasions when she asked for time off to attend to her parents—once in April and again on June 23, after the decision to terminate her had been made—she simply followed Pulte's usual and customary procedures for requesting non-FMLA leave by contacting her supervisor, who approved the requests. Because an employee can be completely ignorant of the benefits conferred by the FMLA and still be entitled to its protections, *see Stoops v. One Call Commc'ns., Inc.*, 141 F.3d 309, 312 (7th Cir. 1998), the more pertinent question is whether Nicholson put Pulte on inquiry notice that she wanted FMLA-qualifying leave, *see id.*; *see also Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004) ("[T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave.").

To put Pulte on inquiry notice, Nicholson was not required to specifically refer to the FMLA so long as she "alert[ed] [her] employer to the seriousness of the health condition." *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007).[2] And where, as here, the need for

---

[2] An employee may be excused from specifically expressing a need for medical leave in certain limited situations—when, for example, the employee's circumstances obviously suggest

(continued...)

leave concerns a family member rather than the employee herself, the employee should also indicate that leave is sought to care for that person. *See* 29 C.F.R. § 825.302(c) (providing that notice may state "that the condition renders the family member unable to perform daily activities"); *see also id.* § 825.124(a) (defining when an employee is "needed to care for" a family member). If Nicholson provided sufficient notice that she needed time off to care for her seriously ill parents, then Pulte had a duty to inquire further to confirm Nicholson's FMLA entitlement. *Aubuchon*, 359 F.3d at 953 (citing 29 C.F.R. §§ 825.302(c), 825.303(b), 825.305(d)).

Here, the evidence falls short of establishing inquiry notice. Nicholson had one "casual conversation" with Naatz and others about the challenges of dealing with aging parents and may have mentioned her father's condition. This is clearly insufficient as a matter of law to notify Naatz that FMLA-qualifying leave was needed. Wilhelm knew more, but still not enough to give rise to the duty to inquire further. With respect to Nicholson's mother, prior to June 22—the day the decision was made to fire Nicholson—Nicholson had only

---

[2] (...continued)

the need for medical leave. *See Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381-82 (7th Cir. 2003). Assuming this exception is available where the employee is caring for a family member, it does not apply here. Nicholson has not shown that her parents' medical conditions resulted in a "dramatic, observable change" in her work performance. *See Burnett v. LFW Inc.*, 472 F.3d 471, 479-80 (7th Cir. 2006).

told Wilhelm that she was driving her mother to medical appointments *on her days off* and that she could not work *outside her normal hours* because of her responsibilities to her parents. Nicholson never indicated that she needed time off to care for her mother; nor did she describe the seriousness of her mother's condition.

Whether Nicholson gave sufficient notice to Wilhelm regarding her father is a closer question. Nicholson told Wilhelm in December 2008 about her father's cancer diagnosis and said that she *might* need time off in the first quarter of 2009 due to her father's *possible* need for chemotherapy. Nicholson herself characterized the matter as "open-ended" because of the uncertainties surrounding her father's need for treatment. After that Nicholson asked for, and was granted, one day off in April 2009 to attend a medical appointment with her father. She later told Wilhelm that her father's diagnosis had worsened to stage III cancer, but did not mention a possible need for additional time off. Thus, while Wilhelm was alerted to the seriousness of Nicholson's father's health condition, she was not on notice that Nicholson needed medical leave to care for him.

Nicholson relies on *Burnett*, but that case is easily distinguishable. *Burnett* involved FMLA leave for an employee's *own* medical needs, not for the purpose of caring for an ill family member. In *Burnett* the employee gave "an account of symptoms and complaints, which formed a coherent pattern and progression, beginning with initial symptoms, continuing with doctor's visits, and then additional testing and re-

sults—all communicated (in one form or another) to [his supervisor]." 472 F.3d at 480. This, we held, was sufficient to place the employer on inquiry notice. *Id.* at 478.

Here, there was no similar pattern of communication. And because it was Nicholson's parents—not Nicholson herself—who suffered from serious medical conditions, the need for FMLA leave was not as obvious as it was in *Burnett*. While Nicholson did inform Wilhelm of her father's serious diagnosis, she did not communicate that she needed time off to care for him. At most, she commented on the *possibility* that she might in the future have a need to take time off to care for her father. But Nicholson herself said the matter was "left open-ended" because of uncertainties surrounding her father's need for care. Thereafter, on just one occasion, she asked for—and was granted—a day off to attend a doctor's appointment with him. There were no leave requests pending when Naatz and Wilhelm decided to terminate Nicholson's employment. Nicholson's conversations with Wilhelm were too indefinite to put Pulte on FMLA inquiry notice.

The facts we have just discussed illuminate another problem with Nicholson's claim. There is insufficient evidence that Pulte did anything to deny or otherwise interfere with Nicholson's right to FMLA benefits. At no time did Wilhelm decline Nicholson's request for leave; on the contrary Wilhelm offered to do anything she could to help. Nicholson makes a half-hearted attempt to argue that her request for a day off on April 27 to attend her father's doctor's appointment was only

partially granted. But Wilhelm excused Nicholson during regular business hours that day and merely rescheduled a mandatory meeting to the early morning hours to accommodate the medical appointment.

Of course, a termination may constitute a denial of benefits. *See Kauffman*, 426 F.3d at 884 (7th Cir. 2005) ("A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory . . . ."). But here, Naatz and Wilhelm made the decision to terminate Nicholson two months *after* Wilhelm granted her isolated leave request and before any additional requests were made. Nicholson suggests that the decision was made on June 24—not June 22—*after* she asked for time off on June 23 to take her mother to the hospital. This is entirely speculative. Wilhelm and Naatz testified that they made the decision to terminate Nicholson on June 22 based on her failure to show any progress on her performance-improvement plan. They also testified that they postponed notifying Nicholson until the end of her workweek two days later so that they could arrange coverage for her office. There is nothing in the record contradicting this account. Accordingly, the district court properly entered summary judgment in Pulte's favor on Nicholson's FMLA interference claim.

## B. FMLA Retaliation

As a threshold matter, Nicholson's retaliation claim requires some evidence that she engaged in FMLA-protected activity. *See Burnett*, 472 F.3d at 481-82. The

district court held that because Nicholson did not provide sufficient notice of the need for FMLA-qualifying leave, she never engaged in any activity protected by the FMLA. For the reasons we have explained, we agree. But even assuming that Nicholson engaged in protected activity—assuming, that is, that her request for a day off on April 27 to attend her father's medical appointment counted as a request for FMLA leave—her retaliation claim still falls short.[3]

A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly. *Kauffman*, 426 F.3d at 884. Under the direct method of proof, the plaintiff must have sufficient evidence, direct or circumstantial, that her employer intended to punish her for requesting or taking FMLA leave. *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009). Additionally, the plaintiff can try to prove retaliatory intent indirectly by showing that she was performing her job satisfactorily but was treated differently from similarly situated employees who did not request FMLA leave. *Id.* Nicholson attempts both methods of proof. The undisputed evidence plainly establishes that Nicholson was not performing her job satisfactorily, so her case under the indirect method fails at the first step in the analysis. As for the direct method

---

[3] Nicholson also alleges that she engaged in protected activity on June 23 by requesting leave to take her mother to the emergency room. As previously discussed, however, Pulte had already decided to fire her at that point.

of proof, Nicholson offers only circumstantial evidence of retaliatory intent, and it comes up short.

First, Nicholson points to what she claims is suspicious timing, noting that Naatz instructed Wilhelm to place her on a performance-improvement plan on April 26, the day after she asked Wilhelm for a day off to attend her father's doctor's appointment. But there is no evidence that Naatz knew about Nicholson's request for a day off or the reason for it. Moreover, there is ample evidence that Naatz imposed the performance-improvement plan because of Nicholson's failure to make a single sale in April and for other on-the-job problems—namely, her lack of knowledge about her sales area and two specific customer complaints.

Nicholson also argues that the "shifting and inconsistent" timing of the termination decision is circumstantial evidence of retaliatory intent. There is simply no evidence to support this claim. Naatz and Wilhelm testified that they made the decision to terminate Nicholson on June 22 because she had not made progress on her performance-improvement plan; indeed, Nicholson failed to make a single sale in either May or June. They also testified that they delayed notifying Nicholson of their decision until June 24 to arrange coverage at Nicholson's sales office. There is no inconsistency or "shifting" rationale here, and no evidence contradicts their account.

Finally, Nicholson contends that she was treated differently than other sales associates who were placed on performance-improvement plans. This contention rests

primarily on her assertion that it was unusual for the company to terminate an employee before the expiration of a performance-improvement plan. But the evidence is undisputed that Nicholson's plan was itself unusual—she was given 60 days instead of the usual 30 to improve, and she was also told that she was subject to termination if she showed insufficient improvement at the end of the first month. She also notes that only a few sales associates actually made or exceeded their sales goals in 2009 based on the downturn in the housing market, and not all those who failed to meet their targets were fired. This general trend among sales agents is too attenuated to raise an inference that Naatz and Wilhelm were motivated by retaliatory intent. The district court properly entered summary judgment for Pulte on Nicholson's retaliation claim.

AFFIRMED.