In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-2118

DYAMOND DAVIS and ANTIONETTE BURNS,

*Plaintiffs-Appellants*,

*v.*

ILLINOIS DEPARTMENT OF HUMAN SERVICES,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:18-cv-02246 — **Colin S. Bruce**, *Judge*.

———————————

ARGUED APRIL 12, 2023 — DECIDED MAY 14, 2025

———————————

Before SCUDDER, KIRSCH, and LEE *Circuit Judges*.

LEE, *Circuit Judge*. On May 12, 2017, Dyamond Davis told her supervisor at the Shapiro Development Center, an assisted living facility operated by Defendant Illinois Department of Human Services ("DHS"), that she had to leave work due to morning sickness caused by her pregnancy. Her supervisor agreed, reminding Davis to complete the necessary timekeeping paperwork.

Several weeks later, DHS granted Davis's request for preg-
nancy leave under the Family and Medical Leave Act,
29 U.S.C. § 2601 *et seq.* ("FMLA"), retroactive to May. Never-
theless, it later determined that a portion of her absence on
May 12 was unauthorized for two reasons. First, it believed
that Davis's FMLA leave did not cover morning sickness; sec-
ond, it concluded that Davis had violated Shapiro's policies
requiring the substitution of accrued paid leave for FMLA
leave. And so, DHS terminated Davis's employment in ac-
cordance with its attendance plan.

Following an unsuccessful appeal of her termination to the
Illinois Civil Service Commission, Davis brought suit, alleg-
ing that DHS had interfered with her FMLA-protected rights.
Another Shapiro employee, Antionette Burns, joined the com-
plaint asserting a substantially similar claim. After discovery,
the district court dismissed Burns's claim for lack of Article III
standing and entered summary judgment in favor of DHS on
Davis's claim. *Davis v. Ill. Dep't Hum. Servs.*, No. 18-CV-2246,
2022 WL 2287938, at *11 (C.D. Ill. May 31, 2022). Davis and
Burns appealed.

Because we agree that Burns has failed to establish a con-
crete injury-in-fact, we affirm the district court's dismissal of
her claim without prejudice. But because we find that dis-
putes of material fact exist as to Davis's FMLA claim against
DHS, we reverse the district court's grant of summary judg-
ment as to her claim and remand for further proceedings.

## I.

### A. The FMLA and Pregnancy

A review of the applicable law will provide a helpful
framework for the facts in this case. Under the FMLA, eligible

employees are entitled to twelve workweeks of leave during any twelve-month period due to a "serious health condition" that renders them "unable to perform the functions of [their] position." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is one that involves "continuing treatment by a health care provider" and includes any period of incapacity due to pregnancy or prenatal care. *Id.* § 2611(11)(B); 29 C.F.R. § 825.115(b). Moreover, absences attributable to pregnancy-related illnesses, such as severe morning sickness, qualify for FMLA leave even if the employee does not visit the doctor during the absence. 29 C.F.R. § 825.115(f); *see id.* § 825.120(a)(4). In short, the FMLA applies to both pregnancy and pregnancy-induced morning sickness.

Although pregnant employees are entitled to FMLA leave for morning sickness, that right is not absolute. Employers have the right to require that their employees provide a medical certification to justify the need for leave due to any serious health condition. 29 U.S.C. § 2613(a). And where an employee seeks intermittent leave for a serious health condition "that may result in unforeseeable episodes of incapacity," the employer is entitled to require a medical certification that includes "information sufficient to establish the medical necessity" for such intermittent leave. 29 C.F.R. § 825.306(a)(7). In other words, employers may require pregnant employees to medically certify the need for intermittent leave due to morning sickness, just as employers are entitled to seek medical certification of any other serious health condition.

Where an employer, like DHS, exercises its right to require a medical certification, an employee must provide a "complete and sufficient" certification. *Id.* § 825.305(c). If the employer believes the certification to be incomplete or

insufficient, it is obligated to inform the employee and "state in writing what additional information is necessary to make the certificate complete and sufficient." *Id.* § 825.305(c). A certificate is incomplete if "one or more of the applicable entries have not been completed," and it is insufficient if "the information provided is vague, ambiguous, or non-responsive." *Id.* The employer must give the employee seven calendar days to cure any deficiency. *Id.*

Once approved for FMLA leave, an employee must give proper notice when taking protected leave. She must state some "qualifying reason" for the leave, but she need not "expressly assert rights under the Act or even mention the FMLA." *Id.* § 825.301(b). Although FMLA's notice obligations are not onerous, an employee may be required to comply with the employer's "usual and customary notice and procedural requirements" for requesting time off. *Id.* §§ 825.302(d), 825.303(c). If an employee does not abide by these requirements and her failure is not justified by any unusual circumstances, approval of FMLA leave may be delayed or denied. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012); *see Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685, 687 (7th Cir. 2010) (no interference where internal notice policy required employees to report to work, return a particular form, or obtain a "call-in code number" within five days of their initial return-to-work date); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002) (no interference where internal notice policy required an employee to notify her employer of her inability to work each day of her FMLA leave).

Additionally, although FMLA leave is generally unpaid, the Act allows an employee to substitute accrued paid leave

for FMLA leave. The Act also allows an employer to require that its employees substitute accrued paid leave for unpaid FMLA leave. 29 C.F.R. § 825.207(a). In such cases, any accrued paid leave "will run concurrently with the unpaid FMLA leave," and the employee will be paid during the leave that would otherwise go unpaid. *Id.*

When an employer requires substitution of accrued paid leave under this provision, "the employer must inform the employee that the employee must satisfy any procedural requirements of the paid leave policy only in connection with the receipt of such payment." *Id.*; *see also id.* § 825.300(c)(iii) (employers must notify employees of "[t]he employee's right to substitute paid leave, whether the employer will require the substitution of paid leave, the conditions related to any such substitution, and the employee's entitlement to take unpaid FMLA leave if the employee does not meet the conditions for paid leave.").

Notably, an employee remains entitled to her unpaid FMLA leave even if she fails to comply with the employer's paid leave substitution policy, although she will not be entitled to any pay during the leave. *See id.* § 825.207(a) ("If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave.").

**B. Shapiro's FMLA Policies[1]**

Shapiro provides eligible employees with an FMLA packet whenever they request FMLA leave or Shapiro learns that they have missed work for a potentially FMLA-qualifying reason. This packet includes, among other things, a blank medical certification form for the employee's doctor to complete, as well as a document entitled "FMLA Reminders," which sets forth Shapiro's internal FMLA policies and procedures. These policies form the crux of this appeal.

Turning first to Shapiro's FMLA notice requirements, when an employee requests FMLA leave, the company requires her to verbally indicate that the absence is for "FMLA" purposes or otherwise state a medical condition that is covered by the Act. The employee also must comply with Shapiro's standard "call-off procedures" (that is, calling in at least one hour prior to a missed shift or notifying the appropriate supervisor when leaving early). Shapiro's FMLA Reminders do not expressly provide any penalty for failing to follow these notice procedures but, as explained above, an employer may deny FMLA leave if an employee fails to provide proper notice of an absence. *See Nicholson*, 690 F.3d at 825.

In addition, Shapiro requires an employee, when taking FMLA leave, to substitute any accrued paid leave for unpaid FMLA leave until all of the accrued paid leave is exhausted. For example, an employee, who takes eight hours of FMLA

---

[1] Although Shapiro is operated by DHS, it retained the authority to issue the personnel policies at issue. Accordingly, we will refer to the policies as "Shapiro" policies with the understanding that DHS enforces these policies.

leave but has four hours of accrued paid sick leave, must use the accrued paid leave as part of her FMLA leave.

Shapiro has more than a thousand employees and understandably requires its employees to know the amount of paid leave they have accrued. To this end, the FMLA Reminders explain that if the employee does not have the requested accrued benefit time to cover the absence, the absence will remain unauthorized "whether or not it is an FMLA related absence" and that "disciplinary action may be taken." If Shapiro receives a request for unpaid FMLA time, but an employee has paid leave time available, "the employee will be required to submit the appropriate forms to utilize the paid benefit time." And if an employee makes "repeated requests" to use unpaid FMLA leave before exhausting paid leave, she may be subject to disciplinary action.

**C. Davis**

Davis was hired as a Support Service Worker in May 2015. On April 29, 2017, she fell ill while at work. She left early and went to Immediate Care, where she learned she was pregnant. Davis subsequently missed work on May 1, May 2, May 5, and May 6, 2017, due to pregnancy-induced morning sickness.[2] Based on these absences, Shapiro gave Davis its FMLA packet, which included the "FMLA Reminders" and the medical certification form for Davis's doctor to complete.

---

[2] Davis's timesheet for May 6, 2017, seems to indicate that she worked a full 8-hour shift. But because the parties do not dispute that Davis missed work that day due to her pregnancy, we will accept the parties' representations for the purposes of this appeal.

Davis's obstetrician, Dr. Kathleen Mahoney, completed the certification, noting that Davis's "medical condition" was "pregnancy" and that her expected delivery date was December 19, 2017. Dr. Mahoney also indicated that, because Davis suffered from lupus, her pregnancy was considered high-risk, and she required "additional testing done in addition to routine prenatal care." The doctor also stated that Davis would need leave to attend monthly medical appointments until September 2017, biweekly appointments thereafter until November 2017, and weekly appointments thereafter until the birth. Moreover, Dr. Mahoney expected Davis to require six weeks of recuperation following childbirth (and possibly more in the event of a caesarean delivery). Finally, Dr. Mahoney answered "no" to the question: "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions."

With this certificate in hand, Shapiro approved Davis for FMLA leave for her pregnancy on June 1, 2017. The approval was retroactive, providing coverage from May 4, 2017, through December 31, 2017. Relying on Dr. Mahoney's statements, Shapiro approved Davis for a single continuous six-week leave period following the birth, as well as intermittent leave to cover her monthly medical appointments (up to two hours each). The approval did not include leave for "possible flare-ups."

Meanwhile, Davis continued to miss shifts due to her pregnancy. On May 11, 2017, Davis was sick and missed work to visit with Dr. Mahoney. She returned to work the next day, May 12, 2017, with a doctor's note. But later that day, after completing four hours of her eight-hour shift, Davis felt ill once again. She told her supervisor, Rebecca Irby, that she

could not complete her shift due to morning sickness and that she wanted to use FMLA leave. Irby, who was aware of Davis's pregnancy, told Davis she could leave for the day and to indicate her absence as FMLA-related on her time report.

When completing the paperwork, Davis sought to use four hours of accrued holiday time to cover the absence in accordance with Shapiro's paid leave substitution policy. But Davis had only three hours and thirty minutes of holiday time remaining. And, because she had not yet been approved for FMLA leave, she did not indicate that the absence was FMLA-related. Although Davis had other types of paid leave available (including sick leave), DHS designated thirty minutes of her May 12 absence as an "unauthorized absence" because, in its view, the absence went beyond the scope of its FMLA approval. Moreover, it determined that Davis had violated Shapiro's paid leave substitution policy by seeking four hours of holiday leave when she had only three hours and thirty minutes available. Because the "unauthorized absence" triggered Shapiro's twelve-step progressive disciplinary policy, DHS eventually terminated Davis's employment.[3]

---

[3] Shapiro's progressive disciplinary policy provides that each occurrence of an unauthorized ("UA") absence (*i.e.*, an absence that is not pre-planned but is properly reported by the employee to her supervisor) counts as a separate offense, and each occurrence of an unexcused ("UX") absence (*i.e.*, an absence that is neither reported to nor authorized by a supervisor) counts as two offenses. After twelve offenses, termination is required. All absences at issue in this case were designated "unauthorized" absences.

**D. Burns**

Unlike Davis, we have very little information regarding Burns's employment history and use of FMLA leave. According to the operative complaint, Burns began working at Shapiro in 2003 and was approved for FMLA leave for various health conditions in 2016, 2017, and 2019. She alleges that, despite these approvals, DHS improperly denied her the use of FMLA leave for various absences deeming them "unauthorized."

## II.

**A. Burns's Standing**

Turning first to Burns, we review *de novo* a district court's dismissal of a party for lack of standing. *Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000). And, as the party invoking federal jurisdiction, Burns bears the burden of establishing that (1) she suffered an injury-in-fact; (2) the injury is traceable to the challenged conduct of DHS; and (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Burns fails at the first step—injury-in-fact.

When a plaintiff's standing is challenged at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. But when, as here, that challenge is brought at summary judgment, the plaintiff may not "rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" that she suffered injury at the hands of the defendant. *Id.*

We, like the district court, see no evidence in the record from which a rational jury could conclude that Burns suffered any injury due to DHS's enforcement of Shapiro's FMLA policies. Unlike Davis, Burns has produced no affidavits, testimonial evidence, or documents (such as timesheets or FMLA approvals) to corroborate her allegations that her FMLA-qualifying absences were denied in violation of the Act. Indeed, she has provided no evidence that she was even approved for FMLA leave at all.

Nevertheless, Burns argues that her injury is "the misclassification of FMLA leave as unauthorized and the accompanying discipline" associated with those absences. And she argues that "if Davis has standing … then it stands to reason that Burns and the putative class [of which Burns is purportedly a member] have standing." But no class has yet been certified. Accordingly, Burns must maintain her own personal interest, which she has not done. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009); *Spokeo*, 578 U.S. at 338 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)). We therefore agree with the district court that Burns has failed to establish that she suffered an injury-in-fact and affirm the dismissal of her claim without prejudice for lack of standing.

## B. Davis's FMLA Interference Claim

Turning to Davis's FMLA interference claim, we review the district court's summary judgment determination *de novo*, viewing all facts and making all reasonable inferences in the light most favorable to Davis. *Goelzer v. Sheboygan County*, 604 F.3d 987, 992 (7th Cir. 2010).

To succeed on her FMLA interference claim, Davis must establish that (1) she was eligible for FMLA protections; (2) DHS was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) DHS denied her FMLA benefits to which she was entitled. *Id.* at 993. There is no dispute as to the first two elements—Davis was eligible for FMLA protections, and DHS was covered by the FMLA.

As for the third element, DHS contends that, based upon Dr. Mahoney's medical certification, it approved Davis's request for FMLA leave only for monthly doctor's appointments and a continuous period of leave after birth.[4] Davis's bouts of morning sickness, DHS argues, are "flare- ups" arising from Davis's pregnancy, and Dr. Mahoney certified that Davis would not require FMLA leave for "flare-ups." Citing *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 314 (7th Cir. 1998), the district court agreed, concluding that DHS was entitled to rely on Dr. Mahoney's statement in the medical certification. Given this factual record, however, we disagree.

First, it is difficult to see how DHS could consider morning sickness to be a "flare-up" of Davis's pregnancy when the FMLA regulations expressly define morning sickness itself to be a "serious health condition involving continuing treatment by a health care provider." *See* 29 C.F.R. § 825.115(f).

Second, while it is true, as a general matter, that an employer may require a medical certification to support a

---

[4] For some reason, DHS's approval does not account for the fact that Dr. Mahoney's certification also noted the need for leave to undergo additional testing and more frequent prenatal appointments as the due date neared.

request for intermittent leave even for morning sickness, here, DHS was well-aware of Davis's need to take intermittent leave for morning sickness when it approved her FMLA request. In such cases, we have recognized that an employee's entitlement to FMLA leave is not strictly bound by the precise parameters laid out in the medical certification.

Consider *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 841 (7th Cir. 2014). There, Hansen provided a medical certification from his doctor indicating that he would experience flare-ups from his medical condition "4 times per 6 months" lasting "2–5 day(s) per episode." *Id.* at 840. When Hansen's absences exceeded this amount, the employer terminated him, pointing in part to the statement in the certification. Observing that the certification form only called for "estimates," we rejected the employer's rationale, noting that Hansen's absences were not so far in excess of the frequency and duration noted in the certification. *Id.*

What is more, in *Hansen*, we favorably cited to *Fritz v. Phillips Service Industries, Inc.*, 555 F. Supp. 2d 820 (E.D. Mich. 2008). In that case, Fritz had been granted continuous FMLA leave in 2003 for a knee surgery. He later claimed that an intermittent, two-day absence in 2005 was covered under FMLA as well because it involved the same "knee condition." *Fritz*, 555 F. Supp. 2d at 822. Relevant here, the *Fritz* court determined that "[t]he absence of any certification that Plaintiff would require leave beyond the initial eight-week recovery period is not equivalent to an explicit certification that Plaintiff did not require any absence from work due to his condition." *Id.* at 825. And the district court denied summary judgment for the employer, reasoning that the employer was on notice that the plaintiff had a serious health condition related

to his knee and should have inquired further into his reasons for taking leave before denying coverage. *See id.* at 826.

The reasoning underlying *Hansen* and *Fritz* guides us here. First, the medical certification Dr. Mahoney completed only sought her "best estimate" of Davis's condition and its potential impact. Furthermore, the certification identified Davis's medical condition as a pregnancy, and DHS personnel knew by early May that Davis was not only pregnant but also suffering from severe bouts of morning sickness that caused her to miss work. Indeed, it was Davis's multiple absences due to morning sickness in early May that prompted DHS to provide Davis with its FMLA packet in the first place. Thus, a reasonable jury could find that DHS knew that Davis would need intermittent leave for morning sickness as a result of her pregnancy when it approved the leave.

Furthermore, a reasonable jury could also find that, given its knowledge of Davis's morning sickness, DHS knew that Dr. Mahoney's certification was incomplete, in which case it should have provided Davis with an opportunity to supplement it. *See* 29 C.F.R. § 825.305(c) ("The employer shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient."); *see also Hansen*, 763 F.3d at 837. DHS did not do so here.

Our decision in *Stoops* is distinguishable. That case involved an employee whose medical certification stated that his medical condition would not require intermittent leave or a reduced work schedule at all. *Stoops*, 141 F.3d at 311. And we found it significant that Stoops knew his employer was relying on this "negative certification" to deny his request for

FMLA leave and was simply arguing that the certification was incorrect. *Id.* at 313. By contrast, Dr. Mahoney's certification affirmatively indicated that Davis's pregnancy would require a reduced work schedule, both during the pregnancy and after the birth, and DHS knew that Davis would miss work due to morning sickness before approving her leave. Thus, triable issues of fact exist as to whether Davis was entitled to FMLA leave on May 12.

The fourth element likewise raises genuine issues of material fact. DHS contends that Davis failed to provide sufficient notice of her need to take FMLA leave when she left work on May 12. But, as the district court acknowledged, Irby—Davis's supervisor that day—testified that Davis had informed Irby that she needed to leave early because she was feeling ill due to her pregnancy and that she wanted to use FMLA leave. This is enough to create a factual issue as to the sufficiency of Davis's notice to DHS on May 12. *See Valdivia v. Twp. High Sch. Dist. 214*, 942 F.3d 395, 400 (7th Cir. 2019) ("Adequacy of notice is a 'fact-rich question' that is 'perhaps best resolved by the trier of fact, particularly, where … the employer and employee dispute the quantity and nature of communications regarding the employee's illness.'" (quoting *Burnett*, 472 F.3d at 479 n.4)).

But our inquiry cannot stop there. According to DHS, even if Davis was entitled to FMLA leave on May 12, she failed to comply with Shapiro's FMLA policies governing the substitution of accrued paid leave for FMLA leave. Thus, DHS asserts, Davis has offered no evidence to show that DHS improperly denied her the FMLA benefits to which she was entitled.

Recall that Davis sought to use four hours of accrued paid holiday time to cover her 4-hour absence on May 12; however,

unbeknownst to her, she had only three hours and thirty minutes of such leave available (although, again, she had four additional hours of paid sick leave). This led DHS to deem Davis's absence on May 12 as "unauthorized," which triggered her termination under Shapiro's attendance policy. In DHS's view, such grounds for termination are permissible under the FMLA, and the district court agreed, noting that the FMLA allows an employer to require its employees to "comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.302(d).

On appeal, Davis first contends that Shapiro's paid leave substitution policy on its face violates the FMLA. As she sees it, § 825.302(d) by its terms only applies to situations when an employee *requests* FMLA leave; it does not apply when, as here, an employee fails to satisfy the employer's policies on how to record and account for leave time after the FMLA leave is approved.

As additional support, Davis points to 29 C.F.R. § 825.207(a), which governs when and how an employer may require an employee to substitute accrued paid leave for unpaid FMLA leave. That provision states, in part, that "[i]f an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave." *Id.* To Davis, this means that an employee's failure to follow her employer's paid leave substitution policy may preclude her from using accrued paid leave while on FMLA leave, but it should not prevent her from taking unpaid FMLA leave at all.

In response, DHS contends that the FMLA allows it to discipline Davis for failing to comply with its paid leave substitution policy. In support, DHS cites to § 825.302(d) and related cases. But in doing so, it confuses an employer's rights under § 825.302(d) with those under § 825.207(a).[5]

As Davis points out, § 825.302(d) allows employers to impose notice and procedural requirements an employee must follow when requesting leave or calling off work for FMLA-related reasons. This is evident from the very first sentence of § 825.302(d), which states, "An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for *requesting leave*, absent unusual circumstances." 29 C.F.R. § 825.302(d) (emphasis added). And, consistent with this focus, the provision goes on to provide examples of such permissible requirements, all of which discuss instances when an employee requests FMLA leave or asks for time off. The consequences for an employee who does not follow the employer's notice and procedural requirements for requesting FMLA leave are significant—the employer can delay or deny the FMLA-protected leave. *Id.*

By contrast, § 825.207 allows an employer to establish procedural requirements when an employee with approved FMLA leave wishes "to substitute accrued paid leave for

---

[5] For example, DHS argues that "[e]ven assuming for the sake of argument that the FMLA did cover Davis' May 12, 2017 absence, the FMLA still allowed the Department to discipline her because she violated its standard procedural requirements *for requesting leave*." (Emphasis added). In the same vein, the cases upon which DHS relies all address an employer's ability to mandate certain conditions for requesting leave under § 825.302(d), not for substituting paid leave under § 825.207(a). *See, e.g., Brown*, 622 F.3d at 690–91; *Lewis*, 278 F.3d at 710.

FMLA leave," or when an employer would like to "require the employee to substitute accrued paid leave for unpaid FMLA leave." 29 C.F.R. § 825.207. The provision, however, sets out two significant limitations. First, an employer can mandate compliance with such procedural requirements "only in connection with the receipt of" the accrued pay. Second, even if the employee fails to satisfy the requirements, "the employee remains entitled to take unpaid FMLA leave." *Id.* Nothing in § 825.207 permits an employer to discipline (let alone, terminate) an employee for failing to meet its paid leave substitution policy, particularly when, as here, the FMLA leave has been approved.

This appears to be exactly what DHS did. First, it is undisputed that paragraphs 3 and 4 of the FMLA Reminders impose requirements for the substitution of accrued paid leave for unpaid FMLA leave and, thus, fall within the scope of § 825.207. Second, when Davis failed to comply with these procedures, DHS counted the remaining 30 minutes on May 12 as an "unauthorized absence" rather than allowing Davis to count that time as unpaid FMLA leave. Third, this "unauthorized absence" triggered Shapiro's twelve-step attendance policy which resulted in Davis's termination. In short, a reasonable jury could find that, had DHS counted the 30 minutes as unpaid FMLA leave as § 825.207(a) requires, Davis would not have been fired.

To be sure, under § 825.207(a), an employer is entitled to establish procedures requiring its employees to utilize accrued paid leave in conjunction with unpaid FMLA leave. To the extent that the FMLA Reminders require employees to be familiar with their accrued paid leave and properly account

for it when applying it to unpaid FMLA leave, they appear to fall well within that permissible sphere.

The problem is that Shapiro's paid leave substitution policy appears to extend well beyond that point. Take, for example, the last sentence of paragraph 3 in the FMLA Reminders, which states: "If the employee does not have the requested accrued benefit time to cover the absence, the absence will remain Unexcused (UA) *whether or not it is an FMLA related absence* and disciplinary action will be taken" (emphasis added). Although the meaning of this sentence is not entirely clear and may benefit from further factual development, the face of the text appears to conflict with § 825.207(a)'s mandate that, even when an employee fails to comply with the employer's paid leave substitution procedures, she "remains entitled to take unpaid FMLA leave." 29 C.F.R. § 825.207(a). Furthermore, nowhere do the FMLA Reminders inform Shapiro's employees that an employee is still "entitled to take unpaid FMLA leave if the employee does not meet the conditions for paid leave" as 29 C.F.R. § 825.300(c)(iii) requires.

In sum, an employer can establish notice and procedural requirements that its employees must follow when requesting leave under the FMLA. *Id.* § 825.302(d). An employer also can require its employees to exhaust accrued paid leave concurrently with unpaid FMLA leave and create procedures that employees must follow in the process. *Id.* § 825.207(a). What an employer cannot do is discipline an employee for failing to comply with its paid leave substitution procedures by denying the employee the benefit of using approved FMLA leave time (which, in this case, would have prevented Davis from incurring the "unauthorized absence" that triggered her termination). *See id.* § 825.220(c) (stating that "employers cannot

use the taking of FMLA leave as a negative factor in employ-
ment actions, such as hiring, promotions or disciplinary ac-
tions").

But, even putting this aside, triable issues of fact exist as to
whether DHS correctly applied its FMLA leave policies to Da-
vis in the first instance. For example, the FMLA Reminders
state:

> If a request for FMLA dock time is received, and
> paid accrued benefit time is available to cover
> the absence, the employee will be required to
> submit the appropriate forms to utilize the paid
> benefit time. *Repeated* requests to utilize FMLA
> dock time prior to the exhaustion of paid ac-
> crued benefit time may result in disciplinary ac-
> tion taken with the employee for failure to fol-
> low facility policies and procedures.

Similarly, Shapiro's "Absenteeism & Tardiness" policy pro-
vides that "[c]*ontinued* application of benefit time not yet ac-
cumulated may result in the absence being recorded as unau-
thorized (UA)." But it is not evident from this record whether
Davis's failure to properly account for her 4-hours absence on
May 12 was a repeat offense. Nor is it clear whether this policy
was consistently applied, given that Davis made a similar
mistake on June 13, 2017, and her manager corrected her time
report for her.

Furthermore, DHS contends that Davis failed to properly
alert DHS that she wanted to use FMLA leave for her absence
on May 12. But this fact is disputed. Davis informed her man-
ager about her pregnancy and morning sickness on May 12,
and a reasonable jury could find based upon testimony from

Shapiro employees that this was sufficient under the company's procedures to constitute a request for FMLA leave. Such factual disputes also preclude summary judgment for DHS as to Davis's FMLA claim.

### III.

For the foregoing reasons, we AFFIRM dismissal of Burns's claim for lack of standing without prejudice. But, finding genuine disputes of material fact on Davis's FMLA interference claim, we REVERSE summary judgment in favor of DHS and REMAND the case to the district court for further proceedings.

KIRSCH, *Circuit Judge*, concurring in part and concurring in the judgment. The majority concludes that the Illinois Department of Human Services cannot discipline Dyamond Davis for failing to comply with Shapiro Development Center's paid leave substitution policy because doing so violates the FMLA. The majority reaches this conclusion by first determining that Shapiro's policy falls within the scope of 29 C.F.R. § 825.207(a) and not § 825.302(d). I write separately because I think there is a factual issue that must be resolved by a jury before that determination can be made.

Sections 825.302(d) and 825.207(a) cover different circumstances. Section 825.302(d) applies to an employee's request for leave. Section 825.207(a) applies to any additional requirements the employee must comply with to be paid for that leave, but it doesn't apply to requirements for how an employee must request leave in the first place. That's the domain of § 825.302(d).

DHS argues that Shapiro's "usual and customary notice and procedural requirements for requesting leave," § 825.302(d), include the requirements that its employees know how much paid leave they have accrued and accurately substitute that paid leave when requesting FMLA leave—in other words, that they comply with Shapiro's paid leave substitution policy. DHS's argument makes sense: as part of an employer's usual procedural requirements for requesting leave, the employer might well mandate that its employees keep track of their paid leave and use it all before taking unpaid FMLA leave. Such a requirement would balance the employees' interest in having adequate leave to manage their serious health conditions with the employer's interest in having its employees present to do the jobs it pays them to do. This

balance would be consistent with the FMLA, which creates a floor for leave but not a supplement. Thus, DHS could be correct that Shapiro's paid leave substitution policy is part of its usual and customary notice and procedural requirements for requesting leave. If so, I would agree with DHS that § 825.302(d) controls and that it could deny Davis FMLA leave.

But an employer's usual procedural requirements for requesting leave might be separate from what the employee must do to get paid for that leave. For instance, an employer might only require that an employee request leave by seeking verbal approval from her on-site supervisor. Then, as an additional requirement to get paid for the leave, the employer might require that the employee accurately report on her timesheet the paid leave she is substituting for her unpaid FMLA leave. That is distinct from the requirement for requesting the leave in the first place. If this framework describes Shapiro's policies, I would agree with the majority that § 825.207(a) controls and that DHS could not deny Davis FMLA leave.

The problem is that the existing factual record doesn't provide an answer either way. The policies DHS cites in support of its argument don't conclusively define which of its requirements count as usual and customary for requesting leave. DHS points to Shapiro's Time Off procedures in combination with its FMLA Reminders. While those documents discuss Shapiro's paid leave substitution policy, they do not make clear whether this policy is a usual and customary requirement Davis must follow whenever she requests leave or just an additional one she must satisfy if she wants to get paid for

her leave. Nothing else in the record provides a clear answer either.

So, in my view, whether Shapiro's paid leave substitution policy is part of its "usual and customary notice and procedural requirements for requesting leave," § 825.302(d), or is instead an "additional requirement[] in [its] paid leave policy" that applies "only in connection with the receipt of [accrued paid leave] payment," § 825.207(a), is a question of fact that turns on just what Shapiro's usual and customary procedural requirements for requesting leave are. Because the factual record in this case is inconclusive, I would remand for a jury to determine the answer.